Filed 1/12/22  In re D.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.W., a Person Coming Under the Juvenile Court Law. | |
| S.D. COUNTY HEALTH & HUMAN SERVICES AGENCY, | D078918 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3603) |
| v. | |
| V.W. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant Father.

INTRODUCTION

When 12-year-old D.W. was admitted to a hospital for severe abdominal pain and chronic diarrhea, he weighed 42 pounds, appeared

emaciated, and had other physical findings indicating he had experienced significant malnutrition or starvation over a prolonged period. The San Diego Health and Human Services Agency (Agency) filed a petition alleging that D.W. needed the protection of the juvenile court because he was at substantial risk of serious physical harm or emotional damage based on his parents' failure to provide him with medical and mental health care treatment, their minimization of his low weight, and their conduct in undermining his medical treatment and treatment providers in his presence. (Welf. & Inst. Code, § 300, subds. (b), (c).)[1]

S.M. (Mother) and V.W. (Father) appeal the juvenile court's dispositional order removing D.W. from their custody. They contend the removal order was not supported by substantial evidence and the juvenile court failed to ensure reasonable efforts were made to prevent his removal from their care. We disagree and affirm the order.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background and Prior Child Welfare History*[3]

1. *First Contact with the Agency*

Mother and Father were both minors when D.W. was born in 2008. When D.W. was just over two years old, a relative refused to return him to Mother after a visit because the relative was concerned about drug use in her

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Minor's appeal was dismissed after his appointed counsel filed a brief indicating there were no arguable issues. (*In re Sade C.* (1996) 13 Cal.App.4th 952, 994.)

[3]    We provide a summary of the family's prior contact with the Agency to provide context for the issues on appeal.

2

home.  The relative contacted the Agency and several unannounced home visits found marijuana and paraphernalia within D.W.'s reach.  Mother participated in voluntary services with the Agency for four months.  She did not complete the voluntary program, but made enough progress for the Agency to close the case.

2.     *Second Contact with the Agency and First Dependency Case.*

The Child Abuse Hotline received two referrals in 2012 regarding drug use in D.W.'s home, domestic violence between the parents, and bruising on D.W.'s upper arms, buttocks, and legs.  Then four-year-old D.W. said, "My daddy pinched me" because "I wasn't listen."  D.W. explained that Father told him to put on a T-shirt and got mad when he could not get it on by himself.  D.W. also demonstrated how the parents smoked "weed" with a "bong."  D.W. said he felt "crazy when daddy blow smoke in my face."  A child abuse expert believed most of the bruises were classic pinch marks, but there were also marks that could be consistent with a blow from a linear object.  D.W. weighed 31 pounds and appeared well-nourished.

Mother saw D.W.'s bruises after she was out of town for a few days.  Mother previously told Father not to pinch D.W.  When asked why she would leave D.W. with Father if had injured the boy before, Mother said, "My kid is tough shit.  You can spank him and leave red marks on him and he just laughs."

Father initially refused to meet with the social worker and said D.W. could have bruises from falling on toys.  He eventually admitted pinching D.W. and causing "a couple" of bruises, but said his son had sensitive skin.  He thought D.W. purposefully did not put on the shirt to make him mad.  When the social worker suggested a child that age may need help, Father said D.W. was smart enough not to need help.

3

Father admitted he went on crystal methamphetamine binges, but denied using crystal methamphetamine around D.W. Although Father conceded that he and Mother used marijuana as D.W. watched, he denied blowing smoke in D.W.'s face.

The Agency detained D.W. and filed a petition in October 2012 asserting D.W. came within the jurisdiction of the juvenile court because he had suffered or was at substantial risk of suffering serious physical harm based on father's conduct and both parents' failure to provide adequate care due to their substance abuse.

The court found jurisdiction and ordered D.W.'s placement with his maternal grandmother. The case plan included counseling for the parents to address issues of domestic violence.

Mother participated in services and made progress by employing new parenting techniques. Father, who was arrested and taken into custody on unrelated charges shortly after D.W.'s detention, participated in services while he was in custody. After his release, he engaged in some services, but he did not participate in individual therapy.

In May 2013, the Agency believed Father was residing with Mother even though he was not supposed to reside at that location and was not granted unsupervised or overnight visitation with D.W. The parents visited D.W. without authorization, drank alcohol, and did not follow through with either their services or D.W.'s services. D.W. exhibited increased behavioral issues, such as using profanity and acting aggressively and defiantly.

The grandmother asked the Agency to assess other relatives to care for D.W. She believed she was making things too easy for Mother by caring for him. Thereafter, D.W. was placed with his uncle.

4

The court found the parents made some progress with their case plan and ordered continued services at the six-month review hearing. However, it also admonished them about the seriousness of the case and expressed disappointment in their recent actions.

By the time of the 12-month review hearing, the parents were making progress in meeting their goals. They were serious about their participation and appeared to understand how their actions would contribute to the Agency's ultimate recommendations. The parents wanted to live together with D.W.

D.W. was on target developmentally. His mental health significantly improved and he was able to process emotions after participating in therapy. The therapist attributed the change in his behavior, in part, to the home environment provided by the uncle.

The court returned D.W. to his parents' custody in November 2013, finding they made substantive progress with their case plans. D.W. adjusted well to returning home.

Several months later both parents were arrested on charges related to prostitution. Mother said this was an isolated incident and that she agreed to prostitute because they were struggling to pay their rent. A family friend cared for D.W. until Mother was bailed out of jail.

D.W. liked living with the parents in their new home because he could go outside and play with friends. A social worker found that food was available and that the home was a clean and safe living environment. D.W.'s health was generally good. Mother said she discontinued a steroid prescribed for D.W. several months earlier because she did not think he needed it. The social worker advised Mother to consult with a doctor.

By January 2015, the agency recommended terminating jurisdiction. Although the parents had not participated in all their services, they demonstrated an ability to provide for D.W.'s needs and to safely parent. Shortly thereafter, Mother and Father separated. Mother returned from a weekend away and smelled marijuana in the home. Father admitted he smoked marijuana because of stress, but he denied doing so in front of D.W.

After D.W. missed two weeks of school, a welfare check in February 2015 found him well-fed and in clean clothes, but the house was a mess. Mother said she had used the last of her money to purchase pizza. She gave various reasons for keeping D.W. out of school including work, car trouble, and concerns about the impact of weather on the child's asthma.

D.W. said he was hungry "all the time," but he also said that Mother fixed meals and there was food in the house. D.W.'s school provided him with food because he came to school hungry. The principal also gathered food and supplies for the family. Mother agreed D.W. was always hungry even after a meal.

Although the Agency was troubled by Father's relapse and reports of inadequate food in the home, it continued to recommend terminating jurisdiction because there was no evidence of a protective issue for D.W. The court agreed, terminating jurisdiction and services in February 2015.

3. *Additional Agency Contacts and Professional Referrals*

After D.W. reunified with his parents, the Agency received several other reports of neglect in 2015 and 2016. However, the allegations were closed as either unfounded or inconclusive. D.W. and Mother indicated they had enough food at home. D.W. also said he had plenty to eat when he spent time with relatives. On one occasion, D.W. was observed with bug bites and

decayed teeth. Mother said a doctor had treated the bug bites, but she admitted she did not take the child to the dentist.

D.W. saw a primary care physician in October 2017 for asthma. The doctor referred him to a cardiologist because she was concerned about D.W.'s low weight and complaints of chest pain. She asked the parents to follow-up in three months to track D.W.'s weight progress. D.W. had no documented follow-up care on this issue between 2017 and October 2020.

D.W. was seen at Children's Hospital in March 2018 at the age of nine for suicidal ideation after he attempted to jump from a moving car. Although mental health resources were provided to the family, the parents did not follow through with therapy or counseling for D.W.

B.    *Current Dependency Case*

1.    *Physician Visit for Stomach Pain*

The parents took D.W. to his primary care physician on October 20, 2020 for stomach pain. He had gained less than a pound since his last primary care visit in 2017. D.W.'s height was that of an average six- or seven-year-old child rather than a 12-year-old child. Mother said he had a "terrible appetite" and "eats like a bird." They said they changed his milk and food options, but D.W. worried about "getting fat."

The doctor said D.W.'s belly was not fat, but appeared distended and bloated with air and inflammation. She asked the parents to obtain lab tests that day. Mother wanted to wait because D.W. was upset about receiving immunization shots. They returned for the lab test about a week later. When the physician received abnormal lab results on November 3, 2020, she made an urgent referral to gastroenterology.

7

## 2. *Hospitalization*

On November 6, 2020, the parents brought D.W. to the Children's Hospital emergency room with complaints of severe abdominal pain and chronic diarrhea. He appeared significantly malnourished based on his emaciated appearance, low muscle mass, and digital clubbing.[4] D.W. weighed 42 pounds, which was less than he weighed three years earlier.[5] He was admitted for severe malnutrition and concerns about failure to thrive.

A gastroenterologist determined that his "profound physical exam findings" reflected a long-standing disease. She was concerned that the parents did not seek medical care earlier. A pediatrician with a specialty in child abuse agreed D.W.'s condition presented an overall picture that was concerning for long-term malnutrition.

The parents reported that D.W. had exhibited symptoms of abdominal pain, bloating, diarrhea and picky eating for at least a year, but his weight loss occurred only over the previous month. They were not concerned about his size, saying he was "a small kid who eats a lot." The parents said D.W. had seen pediatricians since 2017, but they could not provide any dates or the names of the doctors.

D.W. denied physical abuse, but described an isolated life playing videogames, watching videos, or being on the computer for school multiple hours per day. He said he ate fast food and breakfast items. Snacks were available at any time and he denied worrying about his weight or eating.

---

[4] "Clubbed" fingers or toes have "a bulbous enlargement of the tip with [a] convex overhanging nail." (Webster's Medical Dictionary https://unabridged.merriam-webster.com/medical/clubbed. [As of Jan. 11, 2022], archived at <https://perma.cc/GZ3Z-T7TA>.)

[5] A 12-year-old child should weigh at least 80 pounds.

D.W.'s arms and chest were thin and his stomach appeared distended. However, he showed a medical provider what he believed was belly fat and described himself as having a "mushed," "wide" or "chubby" body. D.W. watched a program about morbidly obese individuals. He was afraid of gaining so much weight that it would obstruct his breathing and require surgery. As a result, he only ate snacks on days after having a bowel movement.

A psychiatrist determined that D.W. presented with symptoms "seen in patients with severe malnutrition and starvation." The effects of starvation can appear similar to disordered eating behaviors such as anorexia nervosa. These symptoms can include restricting caloric intake, preoccupation with food and weight as well as a distorted body image.

A colonoscopy revealed an intestinal stricture consistent with Crohn's disease. The gastroenterologist discussed the diagnosis with the parents and explained D.W. would require lifelong treatment. Father became defensive and did not believe the diagnosis. Mother was more receptive, but was fearful of the medications and upset at the lifelong diagnosis.

The physician emphasized to the parents the importance for D.W. to have a strict mechanical soft diet to ease the blockage and to use a supplemental nutrition beverage. Nevertheless, the next day Father gave D.W. a "large bacon cheeseburger." Father told D.W. it was okay to eat the burger if he chewed a lot. The physician said it was inappropriate and dangerous to trust a child who had not eaten a full meal for almost a week to chew the food appropriately without supervision or portion control. Mother was apologetic. D.W. became upset when the medical providers removed the burger.

9

Father yelled at the nursing staff in front of D.W. on several occasions, saying D.W. was a picky eater and complaining that hospital food "sucks" and was "worse than jail food." D.W. refused to eat and mimicked Father's sentiments saying the "food sucks." He received nutrition primarily through an intravenous nutrition supply.

Father also said D.W. was lactose intolerant and should not be given a supplemental nutrition beverage. The gastroenterologist confirmed there was no evidence that D.W. was lactose intolerant, and she was troubled by the parents' resistance to giving him a nutrition supplement. The treatment team expressed concern that the parents were impeding D.W.'s care and furthering his refusal to eat.[6]

The child abuse pediatrician concluded that D.W. met the criteria for someone who had experienced torture based on the combined diagnosis for medical neglect, nutritional neglect, and mental health neglect due to lack of follow-up. She believed it was unsafe to discharge D.W. to the parents' care given their inability or lack of capacity to understand and follow the treatment plan and their lack of regard as to how their behaviors impacted his eating and health.

3.    *Agency Initiates Second Dependency Case*

The Agency filed a petition on November 19, 2020, stating that D.W. needed the protection of the juvenile court as an individual described by section 300, subdivisions (b)(1) and (c). Count 1 asserted that he suffered or

---

[6]    Father also yelled at the nurses for not allowing D.W. to close the curtains in his room due to concerns about suicidal ideation. D.W. told a team member "I wanna go home. I'm here against my will. I don't care if I die . . . My family can just cremate me."

was at substantial risk of suffering serious physical harm or illness based on the parents' willful or negligent failure to provide adequate food, clothing, shelter, or medical treatment. Count 2 alleged D.W. was suffering or at substantial risk of suffering serious emotional damage because the parents failed to seek mental health treatment, minimized his extremely low weight, and verbally undermined his treatment providers.

Mother requested a short continuance of the detention hearing. The court granted the request, but found without prejudice that continued care in the custody of the parents was contrary to the child's welfare. The court also found reasonable efforts had been made to prevent the need for removal of the child from the home.

At the continued detention hearing, on November 23, 2020, counsel for Mother and Father argued that the Agency had not proven a substantial risk of harm if D.W. were returned to their care. They believed the Agency could provide services to eliminate the need for removal. Counsel for Mother said that the diagnosis of Crohn's disease helped the parents understand what was going on with D.W. and how to prevent further harm. Mother contended they had taken D.W. for medical care over the years and he had only lost weight recently. She was willing to follow all medical and psychological treatment appointments. Mother's counsel suggested frequent home checks, interviews, and providing Facetime communication between D.W. and the social worker and minor's counsel upon request. Alternatively, Mother requested liberal visitation and voluntary services. Father's counsel joined Mother's arguments but, alternatively, requested D.W.'s placement with the uncle who had previously cared for him.

The Agency urged the court to follow its recommendations and order out-of-home care for D.W.'s safety. It maintained the parents had provided

11

no evidence that D.W. received medical care since 2017 even though the agency asked for documentation.

The court adopted the Agency's recommendations with some modifications. It confirmed its findings that D.W. was as described by section 300, subdivisions (b) and (c) and that continued care in the parents' home was contrary to his welfare. It also found that reasonable efforts were made to prevent or eliminate the need for D.W.'s removal, but that there were no known services available to prevent further detention. The court commented that this was a complicated case, physically and psychologically. It noted that the goal was to reunify D.W. with his parents, but there were "red flags." This was a 12-year-old child who weighed only 42 pounds and exhibited signs of long-term malnourishment. The court believed the parent's failure to seek treatment earlier supported a prima facie showing that D.W. would be at substantial risk if he returned home.

4.      *The Five Months Between Detention and Adjudication*

After the detention hearing, the parents appeared at the hospital several times for unscheduled or unsupervised visits. A social worker reported that D.W. was on video calls with Mother and Father "constantly, all day long." A staff psychologist discovered that D.W. made a secret sound when someone came into the room so the parents would stop talking. The parents also instructed him not to cooperate with nursing staff. Then he refused to eat because the parents were not visiting. Medical staff thought a nasogastric feeding tube could be necessary, but the parents refused. According to the social worker, the parents were unwilling to cooperatively participate within any acceptable boundaries.

By December 2020, D.W. was housed in the medical behavioral unit of the hospital and there was no tentative discharge date. When Mother told

12

D.W. they were no longer allowed to have unsupervised contact, they both became tearful. D.W. asked to see a social worker and questioned why supervised visits were required. When the worker explained it was a court order, he said he understood. He appeared happy, however, about the possibility of his uncle supervising his visits with the parents. D.W. wanted to return home and denied a lack of food in the home saying, "I'm the one that eats the most. I am always eating." He attributed the malnutrition to Crohn's disease.

Mother denied knowing that D.W.'s primary physician made a referral to cardiology in 2017 for low weight and chest pain. She said they brought D.W. to the hospital for concerns about suicidal ideation in 2018 and no one said anything about his weight or nails. She admitted they missed a therapy appointment. Mother said she homeschooled D.W. for fifth grade because he was being bullied. Father conceded they did not take D.W. to a pediatrician for immunizations between 2017 and 2020 because he did not need to go to the doctor during that time.

Mother said D.W. normally weighed 50 pounds. She thought he was small because she was a teenager when she gave birth and she weighed only 90 pounds. Father also said the family is generally small. Still, the parents admitted they took D.W. to the doctor in October for rapid weight loss after Mother noticed D.W. was getting dressed in the closet. They were waiting for a referral, but brought him to the emergency room for stomach pains. Mother denied knowing he was admitted to the hospital for severe malnutrition and failure to thrive.

In response to assertions that they were undermining medical care, Mother said a nurse told them they could give D.W. the burger if it was chewed like soup. Mother claimed she was supervising his chewing when the

13

doctor came in and said he could not have the burger. Father stated that nurses are bad babysitters and that the child abuse physician's comments made the nurses not listen to Father.

From reviewing D.W.'s medical records, a child abuse expert noted that he grew well until age six. He had a body mass index around the 50th percentile and was about 10th percentile on the growth chart. Thereafter, D.W. stopped getting medical care and only saw a pediatrician one time between the ages of six and 12. Mother did not follow-up on D.W.'s mental health issues after he tried to jump out of a moving car. The expert believed D.W.'s medical neglect, starvation, severe malnourishment, and Crohn's disease had gone on so long that he will have long-term consequences. Additionally, the expert was concerned that the parents undermined D.W.'s medical providers in front of him, which eviscerated his trust in doctors.

At a child and family team meeting, D.W. continued to deny he was malnourished. He said, "I came here because I ate too much. I eat the most out of everyone. My two favorite foods of all is burgers and Subway." Father thought the situation was a "big misunderstanding" and did not feel they were being heard. When Father asked if Crohn's disease could present as malnutrition and starvation, the gastroenterologist said it can lead to mal-absorption and probably contributed to D.W.'s condition. However, his clubbed digits showed a severe degree of malnutrition and failure to thrive that exceeded what they would see with Crohn's disease.

Mother thought it would be helpful to have nutrition and medical education classes. She also thought it would be helpful for a nurse to check on D.W. Mother thought he would need mental therapy "after all of this." She said D.W.'s uncle would be the best choice for a placement option with her mother as the next option. Mother agreed to participate in services

14

recommended by the Agency. Father also agreed to participate in services if it helped get his "kid back," but he did not want to participate if he did not have to do so. He agreed that placement with the maternal uncle would be best for D.W. because the uncle had "been through the process" and had cared for D.W. before.

The uncle agreed that nutrition classes and education about the Crohn's diagnosis would be helpful for the family. The Agency had completed the home visit required for resource family approval of the uncle's home and the uncle was working on the required education programs.

The Agency concluded there were no reasonable means of protecting D.W.'s physical and emotional health without removing him from the custody of his parents. It believed the parents' rejection of medical evidence and opinions as well as their lack of understanding and knowledge of D.W.'s medical conditions could lead to life-threatening consequences. The Agency also thought D.W.'s life depended on the parents' understanding and supporting his medical and mental health conditions and treatment.

At a hearing in December 2020, the court noted that people felt Father was trying to intimidate the medical staff. It acknowledged that the parents were emotional about the case and that the issues were complex. The court said the attorneys would address those issues at trial and could present contrary medical opinions. In the meantime, the judge asked Father to remain civil with the doctors even if he disagreed with them. He asked the Agency to make exceptional efforts to allow the parents to visit D.W. for Christmas, but admonished the parents to control their emotions to facilitate such a visit.

In January 2021, after Mother and D.W. requested unsupervised and expanded visits at the hospital, the court modified the order to allow

unsupervised visits with the concurrence of minor's counsel. The court encouraged the agency to expand visits or to allow unsupervised visits if they could occur safely.

D.W. had surgery in February 2021 to remove a portion of his bowel. He initially did well after surgery, but was transferred to the eating disorder service when he did not make progress with eating. Discharge planning included educating the uncle regarding D.W.'s diet, feeding schedule, and outpatient medical follow-up to ensure he gained weight. The Agency recommended placement with the uncle because it would allow D.W. to maintain connections with various family members. The parents and D.W. agreed.

Although the parents became more cooperative, the Agency still had safety and risk concerns because the parents had only participated in parenting classes and had not yet participated in child abuse group therapy. It recommended further services for the family. At a hearing in February 2021, the court again admonished the parents to temper their emotions when dealing with the medical providers. The court emphasized that the case is about D.W. and that they needed to make sure he receives good care even if they do not like the doctors.

D.W. was discharged from the hospital on March 15, 2021 to the care of his uncle after four months of intense nutritional rehabilitation, psychological treatment, and treatment for Crohn's disease. He grew dramatically during hospitalization. The uncle took two weeks off work to ensure D.W. attended all necessary medical appointments and ate meals at scheduled times. D.W.'s maternal grandmother provided care when the uncle returned to work. D.W. appeared well-adjusted and comfortable in the placement. The uncle reported that supervised visits with the parents were going well.

In April 2021, D.W. was doing well clinically and was maintaining a consistent weight around 60 pounds. He was eating three meals a day and taking nutrition supplements to ensure continued weight gain. The uncle made sure he finished meals in a timely manner and removed distractions.

Mother and Father were cooperative and maintained communication with the Agency. They had nearly completed their parenting classes, but still had not engaged in all their services. Mother started therapy, but Father had not completed the psychological evaluation to help the Agency tailor his services. Neither parent was attending child abuse group therapy sessions. The Agency recommended that the child remain out of the parents' care while they participated in continuing family reunification services.

### 5. *Contested Adjudication and Disposition Hearing*

The contested adjudication hearing was held on April 21, 2021.[7] The parents requested dismissal of the petition and denied the allegations of torture, starvation, and abuse. They asserted that medical records from 2020 showed D.W.'s muscle mass was fine and they believed his digital clubbing was attributable to the Crohn's disease and inflammation. Mother and Father maintained that D.W. lost weight rapidly before his hospitalization. They denied knowing of a cardiology referral in 2017 and claimed they did not ignore D.W.'s mental health concerns in 2018. They argued there was no need for the court's jurisdiction because they had received sufficient education to care for D.W.

---

[7] Father's counsel asked for several continuances based on efforts to obtain an expert review. After Father's counsel indicated they would not list an expert witness, Father requested an additional continuance to obtain a second opinion from his health care provider. The request was denied due to the constraints of fast track rules. The court told Father he could continue to pursue the opinion and raise the issue again.

17

D.W. also asked for dismissal of the petition. Minor's counsel, however, agreed that the Agency had proved the petition based on a pattern of medical neglect and failure to arrange medical care over six years. After considering the evidence and the arguments of counsel, the court found by clear and convincing evidence that D.W. was as described by section 300, subdivisions (b) and (c).

Mother testified on the issue of disposition. She said she learned the importance of well-child exams to make sure a child is healthy and growing. She understood D.W. was diagnosed with Crohn's disease, a heart condition, and anorexia nervosa. She described how she needed to treat and monitor D.W.'s medical and mental health conditions. Mother said she would take D.W. to the doctor because Crohn's disease and mental health are going to be a big part of their lives.

Mother said she learned tools in her parenting class to help her understand how D.W. is feeling and how to involve him in family activities. Mother was in therapy for her own anxiety and symptoms so she can be more present for D.W.

Mother's counsel asked the court to return D.W. to Mother's care. Although the parents were living together, counsel argued the court could order no unsupervised time with Father. Alternatively, counsel asked for unsupervised visits for Mother separate from Father so she could help the uncle with childcare.

Minor's counsel, as guardian ad litem, felt the recommendation to detain D.W. out of his parents' custody was appropriate. The severity of his condition caused an increased safety issue and the parents' initial animosity toward the medical care providers undermined his ability and willingness to engage in treatment. Minor's counsel also noted that this was the second

18

dependency case and Father had not completed a psychological evaluation or therapy to address the protective issue.

Although the Agency believed that Mother's statements about understanding D.W.'s diagnoses and watching for concerns were a good start, they did not adequately address how Mother let his issues go on for years without seeking help. The Agency recommended supervised visits until the parents could show insight on that issue.

And after considering the evidence and arguments on the bifurcated issue of disposition, the court ordered D.W. removed from his parents, stating it found by clear and convincing evidence that he would be at substantial risk of harm if returned home and there was no reasonable means to protect him without removal. The court ordered D.W.'s continued placement with his uncle.

Over the Agency's objections, the court ordered unsupervised visitation for Mother two times a week for three hours at a time. The court gave the Agency discretion to allow unsupervised visits with Father and to expand unsupervised visits for Mother with notice to minor's counsel. The court modified the parents' case plan to require substance abuse testing for 90 days only and set a special hearing for consideration of whether the plan requiring a 52-week child abuse program was specifically tailored to the issues presented in the case.[8]

---

[8] At the subsequent special hearing, the court ordered a 52-week child abuse class, which would be specifically tailored for the family after evaluation. If the evaluators did not believe the service would be appropriate, the service would be stricken. The notice of appeal was filed after this hearing, but the parents do not challenge this order in their briefs.

DISCUSSION

The parents do not challenge the court's jurisdiction finding, but contend the court's order removing the child from their custody was not supported by substantial evidence because the court did not make a proper finding that reasonable efforts were made to prevent removal of the minor from their care. We begin with an overview of the general legal principles and then discuss the court's findings on disposition.

A. *General Principles and Standard of Review*

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must hold a disposition hearing to decide where the child should live while under the court's supervision. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) "Generally, the court chooses between allowing the child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification." (*In re E.E.* (2020) 49 Cal.App.5th 195, 205 (*E.E.*).) The court has broad discretion to choose a disposition that serves the child's best interest. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Before removing a child from his or her parent, the court must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means to protect the child without such removal.[9] (§ 361, subd. (c)(1); *E.E., supra,* 49 Cal.App.5th

---

[9] The juvenile court may remove a child from his or her parent if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical

at p. 205.) The court must also determine whether reasonable efforts were made to prevent or eliminate the need for removal of the child from his or her home and state the facts on which its decision to remove the child is based. (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.) To assist the juvenile court, the Agency must describe in its social study "the reasonable efforts [it] made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of potential detriment to the child if he or she remains with the parent." (*N.M.*, *supra*, 197 Cal.App.4th at p. 169.) In determining whether removal from a parent's home is necessary, the court may consider the parent's past conduct as well as current circumstances. (*Id.* at p. 170.)

We review a removal order for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Because section 361, subdivision (c) requires proof by clear and convincing evidence, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 (*O.B.*); see also *In re V.L.* (2020) 54 Cal.App.5th 147, 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].) "In conducting [this] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated

---

custody. . . ." (§ 361, subd. (c)(1)), or "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent" (§ 361, subd. (c)(3)).

the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, at pp. 1011–1012.)

B. *The Court's Disposition Order is Supported by Substantial Evidence*

In ordering the child removed from the parents pursuant to section 361, subdivisions (c)(1) and (3), the court made the statutory findings that there was "a substantial danger to the physical health, safety, protection or physical or emotional wellbeing of the child, or would be if the child was returned home. And there are no reasonable means by which the child's physical health can be protected without removing the child from the parents' physical custody." The court also found that "the child is suffering severe emotional damage, indicated by anxiety, depression. And [there] are no reasonable means [by] which [the child's] mental health may be protected without removing [the child] from the custody of the parents." Finally, the court stated that "[r]easonable efforts have been made to prevent or eliminate the need for the removal of the child from the home of the parents."

Although the court's statement of findings in support of removal did not include a fulsome discussion of the facts of the case, it made the necessary statutory findings in support of removal. Considering the findings in the context of the entire record, we conclude the court's findings were supported by substantial evidence and any failure to state more specific facts on the record was harmless.[10]

---

[10] The court received and considered the Agency's reports including the detention report, the jurisdiction/disposition report, and the addendum reports. These reports tracked D.W.'s medical history and progress as well as the parents' interaction with the medical professionals and their progress with services. The court also received D.W.'s growth chart as well as his stipulated testimony that he thought the case should be dismissed and he wanted to be with his parents.

The detention report included a discussion of reasonable efforts that were made to prevent or eliminate the need for D.W.'s removal from the home. It noted that the Agency provided the parents with counseling, parent training, and substance abuse treatment in the prior dependency case. The parents began some services, but did not fully engage or complete those services after the child was returned to Mother's care in 2014. The report identified counseling, case management, and parent training along with consistent participation in medical care and education about the child's Crohn's disease, eating disorder and mental health issues as services that could be offered to prevent the need for further detention or facilitate return of the child.

The jurisdiction and disposition report identified as "reasonable efforts" the social worker's efforts to obtain records and interviews regarding the underlying facts and to make referrals for services for both D.W. and the parents. The Agency also undertook concurrent planning efforts for placement with the uncle at the request of both parents.

This case is distinguishable from *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*), cited by Mother, where the appellate court reversed a removal order because the record contained no evidence of reasonable efforts by the department to prevent removal. The department's reports merely cited the statutory language in conclusory fashion without describing its efforts or the alternatives it had considered or rejected. (*Id.* at pp. 809, 811.) The parents here did not cross-examine the social worker or object to the adequacy of the Agency's reports regarding reasonable efforts. They did not suggest, as Mother does on appeal, that she could live with the uncle's family and the child as a reasonable alternative to removal. Failure to object at the trial court forfeits the issue on appeal. (*In re A.S.* (2018) 28 Cal.App.5th 131, 151;

23

see also Civ. Code, § 3515 [one who "consents to an act is not wronged by it"].)[11]

The court also took judicial notice of the prior findings and orders in the case. Among those prior findings were those made at the detention hearing. The court found by a preponderance of evidence that placement out of the home was necessary because there was a substantial danger to D.W.'s physical and emotional health and there was no reasonable means to protect his physical or emotional health without removing him from the parents' physical custody. The juvenile court stated "this is a complicated case, physically and psychological[ly]." "This is a 12-year-old who weighs 42 pounds and the problem is not simply that [the child is] underweight, but that . . . there's evidence of long-term malnourishment." The court also stated that the failure to seek treatment earlier showed the child was at substantial risk if returned home.

Although the standard of proof at disposition is higher than at detention, the severe facts that brought D.W. into the dependency system did not change between the detention hearing and the adjudication hearing. At the disposition hearing, the court referred to the case as "horrific" and said in the context of considering Mother's request for unsupervised visits, "[t]here's a lot going on with [D.W.]"

The reports and medical evidence provided substantial evidence of severe malnutrition and significant mental and emotional issues indicating that D.W. experienced years of medical, nutritional, and emotional neglect by

---

11  We note that in the prior dependency case, D.W. was placed with the same uncle after grandmother said she could not continue to care for him. There is no indication anyone suggested Mother could live with the child in the uncle's household, either in the prior case or this one.

24

his parents. Yet they failed to acknowledge his weight loss and other physical symptoms and did not seek or follow-up on medical care, even when directed to do so. When D.W. was hospitalized, the parents disagreed with the diagnosis, discounted concerns regarding his weight, and undermined the opinions and recommendations of the medical professionals who cared for him. In the months before the adjudication hearing, the court repeatedly admonished the parents to cooperate with and be civil with medical staff who were attempting to care for D.W.

Further, this is not the parents' first dependency case. In determining whether a child may be safely maintained in the parent's physical custody, the court may consider the parent's past conduct if there is reason to believe the conduct will continue. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Although the facts of this case are different than the prior case because there was no evidence of bruising or physically abusive discipline, the severity of D.W.'s malnutrition and the parents' neglect to provide medical or mental health care was another form of physical abuse.

The juvenile court judge was familiar with the family not only from observing their conduct during this dependency case, but also during the prior dependency case. As such, the court was in the best position to evaluate the credibility of the parents' statements about what they have learned and the risk to D.W. if he returns home before the parents are ready. It is not hyperbole to say D.W.'s life depends on the ability of the parents to understand his medical and nutritional needs and to follow-through with medical recommendations.

The evidence showed D.W. made enough physical progress to be discharged from the hospital, but it was apparent he still faced significant physical and mental health issues. The parents also made some progress in

25

being more cooperative in the weeks before the hearing. However, the record shows that the parents have a pattern of not consistently following through on direction from medical care providers, social workers, or the court.

As of the time of the adjudication hearing, the parents had not engaged in all their services. They still minimized the concerns about D.W.'s weight and disagreed with the assessment of malnutrition due to starvation, attributing his problems solely to the Crohn's disease. The Agency believed the parents "continue to lack insight in regards to the protective issues, the Agency's concerns and the seriousness of [D.W.'s] current medical condition." The Agency believed this "lack of insight is dangerous for [D.W.]" if the child were returned to their care.

A parent's lack of insight into and denial of dependency issues support a finding that the parent is not likely to modify behavior without court supervision. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

When considering Mother's request for unsupervised visits, the court stated it did not "[discount] the facts of the case," but believed Mother had earned the opportunity to "do some parenting" with D.W. The court wanted to allow her to prove herself in a limited setting before returning him to her care. The court said it would modify the order if there were problems with the visits.

26

We may infer from the totality of the record that the court did not believe there were reasonable means at the time of adjudication to safely return D.W. to his parents until both he and the parents make additional progress. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1127 [a juvenile court could reasonably determine based on prior conduct that a child could not be safely placed in a parent's custody in the hope the parent would comply with court orders or Agency supervision].)

This case is starkly different from the other cases cited by Mother. The case of *In re Henry V.* (2004) 119 Cal.App.4th 522 involved a single instance where a child sustained unexplained burns on his bottom, apparently from a curling iron. (*Id.* at p. 526.) The appellate court reversed a removal order because the juvenile court did not make dispositional findings based on clear and convincing evidence and did not consider allowing the completion of a bonding study while the child was placed with the mother as a reasonable alternative to removal. (*Id.* at pp. 529–530.) *In re Ma. V.* (2021) 64 Cal.App.5th 11 involved removal of mother's children based on domestic violence between mother and her then boyfriend. (*Id.* at p. 14.) By the time of disposition hearing, however, months had passed since any domestic violence episodes, mother had left the boyfriend, and she testified she was completing voluntary services through the Veteran's Administration. The juvenile court agreed the issues that brought the children into detention had aged out and that the mother had changed. However, the court removed the children from mother's care based on the " 'historical issue of domestic violence' " and the lack of independent confirmation from the Veteran's Administration that mother was engaged in voluntary services. (*Id.* at pp. 20–21.) The appellate court reversed, concluding there was insufficient evidence by a clear and convincing standard to remove the children and

27

expressed concern about removing children based on "historical" evidence of domestic violence. (*Id.* at p. 25–26.)

In contrast, the Agency has been involved with this family for most of D.W.'s life. He suffered years of severe neglect, both physically and emotionally. Although the parents began to be more cooperative with medical providers and showed some progress with their services shortly before the adjudication and disposition hearing, there was substantial evidence that D.W.'s removal from the parents was necessary for his wellbeing until they make further progress with their services to show they can protect and care for him.[12]

---

[12] Even if we were to conclude that the court failed to make sufficient factual findings for removal under section 361, subdivision (c), such a failure can be either harmless or prejudicial error depending on the circumstances. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [failure to make required findings "will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody' "].) Under the circumstances presented here, we find it improbable that the juvenile court would have made a different decision on the question of D.W.'s removal even if it had recited additional factual findings. Therefore, any error was harmless. (*In re Celine R.* (2003) 31 Cal.4th 45, 58, 60 [harmless error test applies in dependency matters].)

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.